159 A.3d 443

## SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellee

v.

## CITY OF PHILADELPHIA and Philadelphia Commission on Human Relations, Appellants

### No. 10 EAP 2016

Supreme Court of Pennsylvania.

ARGUED: September 13, 2016

DECIDED: April 26, 2017

Martin C. Cunningham, Esq., PA Human Relations Commission, Kathy Weaver Morrison, Esq., for Pennsylvania Human Relations Com'n, Appellant Amicus Curiae.

Kelly Susan Diffily, Esq., Richard Gerson Feder, Esq., for City of Philadelphia and Philadelphia Com'n on Human Relations, Appellants.

Andrew A. Chirls, Esq., Fineman Krekstein & Harris, Mary Catherine Roper, Esq., American Civil Liberties Union of

Pennsylvania, Thomas William Ude Jr., Esq., Mazzoni Center, for American Civil Liberties Union of Pennsylvania and Mazzoni Center, Appellant Amicus Curiae.

Gino J. Benedetti, Esq., Katharine Virginia Hartman, Esq., Patrick Michael Northen, Esq., Dilworth Paxson, L.L.P., for Southeastern Pennsylvania Transp. Authority, Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

JUSTICE MUNDY

This case comes to us for a second time to determine if the Southeastern Pennsylvania Transportation Authority (SEPTA) is exempted from the jurisdiction of the City of Philadelphia (the City) via the Philadelphia Commission on Human Relations (Philadelphia Commission) and the provisions of the Philadelphia Fair Practices Ordinance (FPO). We previously remanded this case to the Commonwealth Court to ascertain the legislative intent regarding this issue by employing the analysis set forth by this Court in Dep't of Gen. Servs. v. Ogontz Area Neighbors Ass'n, 505 Pa. 614, 483 A.2d 448 (1984). See Southeastern Pennsylvania Transp. Auth. v. City of Philadelphia, et al., 627 Pa. 470, 101 A.3d 79, 90–91 (2014) (SEPTA III). On remand, the Commonwealth Court determined that, applying the Ogontz test, the language and statutory scheme of the relevant statutes revealed the legislature's intent to exempt SEPTA from actions brought under the FPO. Southeastern Pennsylvania Transp. Auth. v. City of Philadelphia, et al., 122 A.3d 1163, 1173 (Pa. Cmwlth. 2015) (SEPTA IV). For reasons that follow, we affirm the decision of the Commonwealth Court.

This Court recounted the early procedural history of this case in our SEPTA III opinion, which we set forth again here.

This case has its origins in seven administrative proceedings against SEPTA that individuals instituted with the Philadel-

phia Commission from July 2007 through April 2009, alleging violations of the FPO.[2] At least two of the administrative complaints included claims of types of discrimination against which the FPO offers protection, but that the Pennsylvania Human Relations Act ("PHRA")[3] does not cover. SEPTA filed a motion to dismiss each of the administrative cases for lack of jurisdiction, and the Philadelphia Commission denied the motions.

While all seven administrative proceedings were still pending,[ ] SEPTA instituted this civil action against Appellants seeking both declaratory and injunctive relief. SEPTA maintained in its complaint[ ] that because it is a Commonwealth agency, and Appellants are a political subdivision and a municipal agency, respectively, the FPO does not apply to it, and the Pennsylvania Constitution barred Appellants from exercising jurisdiction over it.[ ]

Appellants filed preliminary objections demurring to SEPTA's complaint. Appellants argued that because Philadelphia's powers under the First Class City Home Rule Act[7] [ (FCCHRA) ] extend to enacting and enforcing anti-discrimination laws, the FPO applied to SEPTA and the Philadelphia Commission had jurisdiction over it. Appellants further contended that an original action for declaratory and injunctive relief was inappropriate because SEPTA had to await final agency decisions in the individual administrative cases against it before it could seek appellate review in court. In response, SEPTA pointed out that the statute authorizing the creation of metropolitan transportation authorities, such as SEPTA, provides that such an authority "shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof," 74 Pa.C.S. § 1711(a), and asserted that Philadelphia's authority as a home-rule jurisdiction extends only to the regulation of its municipal affairs. In its brief in opposition to the preliminary objections, SEPTA did not rely upon, or refer to in any manner, the section of its enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). The

trial court sustained the preliminary objections and dismissed SEPTA's complaint.[ ]

SEPTA appealed to the Commonwealth Court, which reversed. *SEPTA v. City of Philadelphia,* 20 A.3d 558 (Pa. Cmwlth. 2011) *(en banc)* [ (Septa II) ]. A majority of the court concluded that the Philadelphia Commission lacked jurisdiction because SEPTA is an "agency and instrumentality" of the Commonwealth and therefore within the jurisdiction of the Pennsylvania Human Relations Commission (the "State Commission"). The majority noted that the State Commission is responsible for the administration of the PHRA, which bans any "employer" from engaging in certain forms of discrimination. 43 P.S. §§ 955, 956(a). Because the PHRA defines "employer" as including "the Commonwealth or any political subdivision or board, department, commission or school district thereof," [9] and because neither the PHRA nor the FPO explicitly grants the Philadelphia Commission jurisdiction over SEPTA, the majority concluded the State Commission—and not the Philadelphia Commission—had jurisdiction over SEPTA. The Commonwealth Court did not base any portion of its reasoning upon the section of SEPTA's enabling legislation pertaining to sovereign and official immunity. 74 Pa.C.S. § 1711(c)(3). Because the majority considered the State Commission's jurisdiction over SEPTA to be clear, and a Commonwealth instrumentality's challenge to "the scope of a governmental body's action pursuant to statutory authority" through a declaratory judgment action to be proper, the majority also concluded that SEPTA had no duty to exhaust its administrative remedies before seeking relief in court. SEPTA [II], supra at 563.

[ ] Judge Dante Pellegrini dissented. He concluded that SEPTA is not a Commonwealth agency, and even if it were, it would still be subject to the provisions of the FPO and the jurisdiction of the Philadelphia Commission. The dissent stated that the General Assembly had enacted the portion of SEPTA's enabling act that provides that a metropolitan transportation authority such as SEPTA is "an agency and

instrumentality thereof" merely to avoid constitutional and statutory questions, such as limitations on local governments' acquisition of debt. 74 Pa.C.S. § 1711(a). The dissent opined that the cited language was not intended to render SEPTA a state agency for all purposes.

The dissent then concluded that even if SEPTA were part of the Commonwealth government, it nonetheless would be subject to the jurisdiction of the Philadelphia Commission under Commonwealth v. Ogontz Area Neighbors Association, 505 Pa. 614, 483 A.2d 448, 452 (1984). In that case, the Department of Public Welfare ("DPW")—which we characterized as "an agency of the Commonwealth"—applied to the City of Philadelphia for the permits needed to build a facility for the mentally handicapped. Id. at 449–50. The City denied the permits on the ground that the proposed facility did not comply with use and other restrictions under the Philadelphia Zoning Code. On review in this Court, we rejected the notion that DPW was immune from local land regulations because it had the power to condemn property to establish the facility it sought to construct. We reasoned that because the General Assembly had established both the City and DPW, and had fixed the extent of each entity's powers, we would need to examine the enabling act of each entity to determine which entity's authority the legislature had intended to prevail for purposes of the parties' controversy. Because the applicable statutes did not clearly state which entity the legislature had intended to be "preeminent," we applied the rule of statutory construction that a court may determine legislative intent by considering "the consequences of a particular interpretation." Id. at 455 (citing 1 Pa.C.S. § 1921(c)(6)). Because Philadelphia's zoning scheme would have been frustrated if DPW were to have prevailed, while subjecting DPW to local zoning rules and restrictions would not necessarily have frustrated DPW's mandate to establish mental health facilities, we concluded that the legislature had intended the City to have priority in the circumstances at issue.

The dissent here applied the principles we set forth in Ogontz and concluded that, as in Ogontz, the relevant statutes were ambiguous as to which entity was intended to have priority. The dissent therefore considered the effect of holding each entity preeminent and determined that ruling in SEPTA's favor would frustrate the legislature's intended scheme. Characterizing the PHRA as granting the State and Philadelphia Commissions' "concurrent jurisdiction," the dissent explained that deeming SEPTA "preeminent" over Appellants would thwart the legislatively established system of shared jurisdiction. The dissent explained that, on the other hand, treating Appellants as "preeminent" would not interfere with SEPTA's purpose of providing public transportation. The dissent stated, "All the consequence of the City's and the [State Commission's] preeminence means is that SEPTA would still have to respond to complaints, like private companies, of those choosing to file their claims of unlawful discrimination with [the Philadelphia Commission]." SEPTA [III], *supra* at 569 (Pellegrini, J., dissenting).

[2] In general terms, the FPO protects against discrimination: in employment based upon a person's race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status; in public accommodations based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, familial status, or domestic or sexual violence victim status; and in housing accommodation, commercial property and other real estate opportunities based upon race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, disability, marital status, age, source of income, familial status, or domestic or sexual violence victim status. Phila. Code §§ 9–1103, 1106, 1108.

[3] 43 P.S. §§ 951–963. The PHRA protects most, but not all, of the categories of individuals covered by the FPO. In general terms, the PHRA protects against discrimination in employment, housing, and public accommodation because of

race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, and national origin. In addition, it prohibits discrimination based upon the use of a guide or support animal because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals.

. . .

[7] 53 P.S. §§ 13101–13157.

. . .

[9] 43 P.S. § 954.

SEPTA III, 101 A.3d at 82–84 (some citations and footnotes omitted).

In reviewing the Commonwealth Court's SEPTA II decision, we held that the Commonwealth Court's reliance on the status of SEPTA as a Commonwealth agency, was not dispositive of the issue of preemption. Citing Ogontz, County of Venango v. Borough of Sugarcreek, 534 Pa. 1, 626 A.2d 489, 490 (1993), and Hazleton Area Sch. Dist. v. Zoning Hearing Bd., 566 Pa. 180, 778 A.2d 1205, 1210 (2001), we explained that a governmental entity, that derives its existence from the legislature, does not possess inherently superior powers over another such legislatively created entity by virtue of its type or the entity's respective designation as "Commonwealth" or "municipal." SEPTA III at 87. Rather, the question must be resolved through an inquiry into the legislative intent as revealed by the pertinent enabling legislation. Thus, we rejected SEPTA's structure-based argument that for a Municipal Authority to exercise jurisdiction over a Commonwealth agency, it was necessary for the legislature to expressly so provide. Id. at 87–88. We similarly rejected the Appellants' argument that the presumed validity afforded Home Rule enactments resolved the issue of legislative intent. Id. at 88. We, therefore, held that the Commonwealth Court should have pursued an inquiry into the legislative intent in accordance with the stepped analysis first enunciated in Ogontz.

As identified in Hazleton, our opinion in Ogontz, *supra* sets forth the analytical process a court is to follow to determine

which entity the legislature intended to have preeminent powers over a given area of regulation.

> The first step requires the reviewing court to determine, through examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent. Id. In the event there is no such express legislative mandate, the second step requires the court "to determine legislative intent as to which agency is to prevail . . . . turn[ing] to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia*, of the consequences of a particular interpretation."
>
> Hazleton, *supra* at 1210 (quoting Ogontz, supra at 455 (citing in turn 1 Pa.C.S. § 1921(c)(6))) (emphasis omitted).

Id. at 87. In essence, we rejected the Commonwealth Court's status-based analysis and remanded for it to ascertain the legislative intent by applying the Ogontz test to the entities' respective enabling legislation.[1] Id.

On remand, a majority of the Commonwealth Court sitting en banc addressed the first prong of the Ogontz test, which it phrased as "determin[ing] whether one legislative scheme was intended to have priority over the other." SEPTA IV, 122 A.3d at 1168. Looking at the respective legislative schemes, the Majority noted the Metropolitan Transportation Authorities Act (MTAA) established that SEPTA is a Commonwealth agency and instrumentality. Id. at 1169 (quoting 74 Pa.C.S. § 1711(a)). It further noted the MTAA afforded SEPTA sovereign and official immunity. Id. at 1169–70 (quoting 74 Pa.C.S.

---

1. Chief Justice Castille and Justice Eakin filed concurring and dissenting opinions expressing the view that Ogontz should not have applicability beyond the land use and zoning issues involved therein. SEPTA III, 101 A.3d at 92–93 (Castille, C.J. concurring and dissenting); Id. at 97 (Eakin, J. concurring and dissenting). Chief Justice Castille opined that the Commonwealth Court sufficiently reviewed the relevant statutory language and properly concluded it precluded enforcement of the FPO against SEPTA. "No remand to assess legislative intent is called for in this matter because the Commonwealth Court appropriately ascertained and effectuated the General Assembly's intent by looking to, and applying, the plain language of the relevant statutory provisions." Id. at 95; *accord* Id. at 98 (Saylor, J. dissenting).

§ 1711(c)). The Majority observed that 1 Pa.C.S. § 2310 provides that agencies with sovereign immunity may only be sued "where the legislature has *expressly waived* immunity." Id. at 1170 (quoting Ebersole v. Southeastern Pennsylvania Transp. Auth., 111 A.3d 286, 289 (Pa. Cmwlth. 2015) (emphasis added in SEPTA IV)). The Commonwealth Court then reviewed the PHRA, which expressly waives immunity of Commonwealth agencies from actions initiated under it. Id. (citing 43 P.S. § 954). In contrast, the Majority concluded the FCCHRA, which is the source for the City's authority to enact the FPO, does not contain an express waiver of the immunity accorded to Commonwealth agencies. Id. at 1171. The Majority explained that the FPO authorizes private claims, including potential awards for compensatory damages, punitive damages and attorney fees. Id., (citing PHILA. CODE §§ 9–1105, 9–1107). It, therefore, distinguished the provisions of the FPO from the land use and traffic regulation enforcement disputes that were the subjects of earlier cases. Id. at 1171–1172. "The penalties authorized by the [FPO] require an express waiver of sovereign immunity, and none has been expressed by the General Assembly." Id. at 1172.

The Majority rejected the City's argument that Section 12 [2] of the PHRA accomplishes a waiver of sovereign immunity relative to the FPO. It noted that the legislature waived SEPTA's immunity only as to the jurisdiction of the State Commission, and that such waivers are to be narrowly con-

---

**2.** The relevant section provides as follows.

(a) The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply.

(b) Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[.] ... In the event of a conflict between the interpretation of a provision of this act and the interpretation of a similar provision contained in any municipal ordinance, the interpretation of the provision in this act shall apply to such municipal ordinance.

43 P.S. § 962(a), (b).

strued. Id., at 1172–73 (citing Dean v. Dept. of Transp., 561 Pa. 503, 751 A.2d 1130, 1134 (2000)).[3]

Judge Pellegrini filed a dissent in which he argued an interpretation of the statutory language as revealing the intent of the legislature to subject SEPTA to the jurisdiction of the FPO. Id. at 1176 (Pellegrini, J. dissenting). Judge Pellegrini argued that the designation of SEPTA as a Commonwealth agency does not afford it equivalency with the Commonwealth for all purposes, citing cases holding SEPTA's status as a Commonwealth agency is related to the reasons for its creation. Id. at 1177. He notes SEPTA is an "authority" tasked with providing a commercial service. Id. He noted the subject matter in question here, anti-discrimination enforcement, is removed from SEPTA's fundamental transportation function. That is, SEPTA provides a service, not the governing function that appertains to municipalities. Id. Judge Pellegrini viewed the authority afforded the City through the FCCHRA, and section 12 of the PHRA, which permits local governments to concurrently promulgate and enforce anti-discrimination ordinances, as revealing a statutory scheme where the City predominates over SEPTA in the arena of enforcing anti-discrimination laws. Id. at 1183. He concluded "[t]here is nothing in the legislative scheme that would suggest that SEPTA's interests should predominate over the Commonwealth's; everything suggests [the City's] governmental interest predominates." Id. at 1179. Judge Pellegrini also argued that, to the extent SEPTA may be protected by sovereign immunity, such was limited to monetary damages but does not extend to other forms of relief the Philadelphia Commission has at its disposal. Id. at 1182.[4]

3. Acknowledging in light of its holding that it was unnecessary to reach the issue, the Commonwealth Court Majority also proceeded to determine that under the second prong of the Ogontz test a review of the consequences of the competing interpretations of the statutes favored the same conclusion relative to the legislature's intent. SEPTA IV, 122 A.3d at 1175.

4. Judge Simpson authored a separate dissent declaring his view that the matter should be remanded to develop a record about the effects enforcement of the FPO would have on SEPTA's ability to attend to its core functions. SEPTA IV, 122 A.3d at 1185 (Simpson, J, dissenting).

Appellants contend that, in SEPTA III, this Court resolved the first prong of the Ogontz test in their favor, and that the Commonwealth Court erred in ignoring that holding. Appellants' Brief at 24. Appellants argue that the Commonwealth Court Majority "revives the very presumption in favor of SEPTA that this Court directed that it avoid." Id. at 25. In line with its arguments in the prior appeal, Appellants emphasize that the FCCHRA grants the City authority to legislate for its municipal functions as fully as could the Commonwealth's legislature, absent an explicit or implicit preemption by the General Assembly. Id., (citing Warren v. City of Philadelphia, 382 Pa. 380, 115 A.2d 218, 221 (1955)). This includes the authority to enact the FPO. Id. at 26 (citing Devlin v. City of Philadelphia, 580 Pa. 564, 862 A.2d 1234 (2004)). Appellants also rely on the provisions and history of the PHRA, which contemplates concurrent, and perhaps more stringent, local regulation and enforcement in the anti-discrimination arena. Id. at 27. Additionally, Appellants reference the presumptive validity of a municipality's enactments under the Home Rule powers. Id. at 28. Appellants assert that the FCCHRA contains no indication that SEPTA should be excluded from the purview of the Philadelphia Commission's jurisdiction.

Appellants dispute the Commonwealth Court Majority's conclusion that the language and statutory scheme of the MTAA evinces an intent that SEPTA is excluded from the jurisdiction of the Philadelphia Commission and the FPO. Appellants assert that the MTAA's provisions conferring sovereign immunity upon SEPTA "do[ ] not speak to the authority of a municipality to enforce validly-enacted and generally applicable local anti-discrimination legislation against SEPTA," or to legislative intent on the issue. Id. at 31. Appellants

Judge Pellegrini agreed that the record was underdeveloped and would also remand. He further expressed his reasons why he deems the Majority's conclusion, that the impact of such enforcement would be daunting, to be "specious." Id. at 1183. Because we agree that, under the first prong of the Ogontz test, the legislative scheme reveals an intent to shield SEPTA from the FPO, we do not reach, and express no opinion about, the impact on the respective entities of enforcement or non-enforcement under the second part of the Ogontz test.

claim the Commonwealth Court's reasoning adopts the rationale in Chief Justice Castille's dissent, which they assert we rejected in SEPTA III. Id. at 31–32. Appellants argue that relying upon the grant of sovereign immunity in this instance essentially resurrects the presumption and status-based approach favoring Commonwealth agencies that this Court disapproved. Appellants note that the fact SEPTA enjoyed sovereign immunity was not dispositive in Ogontz, where we held SEPTA was not exempt from the City's enforcement of its zoning regulations. Id. at 33–34.

Appellants next argue that the fact that the legislature expressly waived SEPTA's immunity in the PHRA is unavailing to SEPTA because legislative intent as to priority is not discerned by a determination of whether or not a third entity has a role to play, and because the scope of protections afforded by the FPO are greater than those afforded by the PHRA. Id. at 34–35. Finally, Appellants suggest that, to the extent SEPTA's sovereign immunity acts as a bar to enforcement of the FPO against it, it does not implicate all of the enforcement tools available to the Philadelphia Commission. Id. at 37. Sovereign immunity, they point out, has been held to pertain to awards of monetary damages, but not other forms of equitable and declaratory relief. Id. at 38–39.[5] "To argue,

5.  Appellants cite the following cases in support of this contention.
    See Legal Capital, LLC. v. Medical Professional Liability Catastrophe Loss Fund, 561 Pa. 336, 750 A.2d 299, 302–03 (2000) (sovereign immunity did not bar action seeking equitable relief or a declaratory judgment that plaintiff's assignee was entitled to direct payments from the Medical Professional Liability Catastrophe Loss Fund, a Commonwealth executive agency); Wilkinsburg Police Officers Ass'n By and Through Harder v. Com., 535 Pa. 425, 636 A.2d 134, 137 (1993) ("suits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity"); Fawber v. Cohen, 516 Pa. 352, 532 A.2d 429, 433–34 (1987) ("suits which . . . seek to restrain state officials from performing affirmative acts are not within the rule of [sovereign] immunity"—thus, action, which seeks to restrain the Secretary of Welfare and declare his regulations invalid, is not an action for which the Secretary enjoys sovereign immunity); Finn v. Rendell, 990 A.2d 100, 105 (Pa. Cmwlth. 2010) ("sovereign immunity does not bar a declaratory judgment action or injunction seeking to prohibit state parties, i.e., state agencies or employees, from acting"); Stackhouse v. Com., Pennsylvania State Police, 892 A.2d 54, 59–60 n.6, 61 (Pa. Cmwlth.

based on sovereign immunity, that the General Assembly has expressly abrogated all of the [Philadelphia] Commission's jurisdiction, ignores that the bulk of the [Philadelphia] Commission's work is essentially investigatory and administrative." Id. at 40.

The State Commission filed an amicus brief in support of Appellants. It advances the argument that the PHRA expressly provides for concurrent jurisdiction and liberal construction. The State Commission's Amicus Brief at 2. It argues SEPTA meets the definition of a local employer under the PHRA and notes that cases favor "robust" application of anti-discrimination laws. Id. at 4–5. The State Commission argues that its interpretation of the PHRA is entitled to deference as the agency charged with implementing the statute. Id. at 6–7 (citing Office of Admin. v. Pa. Labor Rels. Bd., 591 Pa. 176, 916 A.2d 541, 549 (2007)).

American Civil Liberties Union of Pennsylvania (ACLU) and the Mazzoni Center Legal Services (Mazzoni Center) filed a joint Amicus brief. They reiterate the provisions of the PHRA allowing local ordinances to provide concurrent and greater enforcement. ACLU and Mazzoni Center's Amicus Brief at 22–23. They note that the PHRA and the FCCHRA predate the MTAA which created SEPTA. They argue the enactment of the MTAA did not alter the dual jurisdiction paradigm. Id. at 24. They further argue the MTAA did not meet the criteria under the Statutory Construction Act for repealing those earlier enactments, because it did not constitute a revision of all statutes on a subject, or purport to establish a uniform and mandatory system over the subject matter at issue. Id. at 25–26.[6]

2006) ("sovereign immunity [does not] bar[ ] claims... seeking prohibitory injunctions to restrain state action" or "a mandamus action to compel an agency or officer to perform a ministerial or mandatory statutory duty"); McGriff v. Com., Pennsylvania Bd. of Probation and Parole, 127 Pa.Cmwlth. 167, 561 A.2d 78, 80 (1989) (sovereign immunity was not a proper defense to parolee's mandamus petition seeking to compel Board of Probation and Parole to vacate its recommitment order after parolee's original sentence had been vacated).

Appellants' Brief at 37–38.

SEPTA refutes Appellants' argument that the Common-wealth Court Majority did not properly apply the Ogontz test to the pertinent statutes in this case. SEPTA's Brief at 10. It argues that the Commonwealth Court did not resurrect a status-based priority of SEPTA over the City. Rather, it asserts the Commonwealth Court focused on the intent of the legislature relative to the City's exercise of jurisdiction over SEPTA. Id. at 10–11. SEPTA counters Appellants' assertion that the broad powers afforded the City under the FCCHRA support an inference of the legislative intent respecting pre-emption. SEPTA argues it ignores our holding in SEPTA III, where we stated the presumption of validity is relevant to the authority to act, and not "whether the municipality may enforce ordinances and regulations against a Commonwealth agency or instrumentality." Id. at 16 (quoting SEPTA III, 101 A.3d at 88). SEPTA argues that the MTAA plainly establishes that SEPTA is afforded sovereign immunity. Id. at 18. It notes such immunity must be expressly waived to permit suits against it. Id. at 19 (citing Powell v. Drumheller, 539 Pa. 484, 653 A.2d 619, 621 (1995); Tork–Hiis v. Com., 558 Pa. 170, 735 A.2d 1256, 1258 (1999)). SEPTA notes such a specific waiver is present in the PHRA, but not in the FCCHRA. Id. at 20.

SEPTA argues that, contrary to Appellants' assertions, the Commonwealth Court did view the Ogontz test "through the lens of the specific municipal ordinance... sought to be en-forced," and did not hold that sovereign immunity creates a per se exemption from all municipal jurisdiction. Id. at 21–22. Thus, SEPTA asserts the distinction drawn by the Common-wealth Court between the land use issues, applicable in Ogontz, and the regulations present in the FPO, which include rights of private action and the award of damages, is valid. Id. at 24–25. SEPTA argues Appellants' parsing of the potential enforcement remedies available under the FPO to support an

6. Again, in light of our disposition, we do not address the Amici's arguments related to the second prong of the Ogontz test.

16

inference of legislative intent to permit the Philadelphia Commission's partial jurisdiction over it is inapposite. Id. at 33–34.

■ Appellants sought allowance of appeal, which we granted for decision on the following question, as framed by Appellants:

> Did the General Assembly, when it gave Philadelphia general police powers as expansive as [those] of the General Assembly and specific authority to enact local anti-discrimination laws, intend to exempt SEPTA from compliance with those laws, when the consequence of *compliance* would not materially disrupt SEPTA's core transportation function and the consequence of *non-compliance* would leave hundreds of thousands of Philadelphia passengers and employees without a remedy against many forms of discrimination?

SEPTA v. City of Phila., 635 Pa. 194, 133 A.3d 292 (2016).[7]

### A.

Initially, we address Appellants' assertion that this Court essentially resolved the first prong of the Ogontz test prior to our remand to the Commonwealth Court in SEPTA III. That assertion is mistaken. Ogontz is implicated when a question arises as to legislative intent respecting competing interests between distinct entities created by the legislature. In SEPTA III, we held SEPTA was "wrong in asserting that, in order for a local governmental agency to prevail over a Commonwealth agency or instrumentality, the legislature must have clearly stated its intent in that regard." SEPTA III, 101 A.3d at 87. Rather, we explained "we have applied the Statutory Construction Act in order to discern the legislature's intent." Id. We further held that SEPTA's status-based argument and the City's reliance on the presumptive validity of homerule enactments did not provide such an express directive. Id. at 88. Therefore, we held that it was incumbent upon the Commonwealth Court to apply the two-part test set forth in Ogontz. Id.

---

7. As in our earlier review of this case, the issue before us is one of statutory interpretation. "Our standard of review of such a question of statutory interpretation is de novo, and our scope of review is plenary." SEPTA III, 101 A.3d at 87 (citing Hazleton, 778 A.2d at 1213).

at 90. The first prong of that analysis requires an examination of the overall language of the legislation to discern if the General Assembly expressly intended one or the other to be preeminent. Ogontz, 483 A.2d at 455. While it is undisputed that neither enabling statute contained an explicit provision directly addressing the issue, that fact did not preclude the possibility that an examination of the statutes as a whole would reveal such a clear intent. Our holding merely recognized that the Commonwealth Court in SEPTA II did not perform a review to discern the legislature's intent because it relied on the status of SEPTA as a Commonwealth agency, treating the competing entities in a hierarchical manner. SEPTA III, 101 A.3d at 87. We also noted that, as of the time of the appeal in SEPTA III, SEPTA had not relied on the sovereign immunity provisions and the Commonwealth Court did not base any of its reasoning thereon. Id. at 83. Accordingly, we did not determine the first prong of the Ogontz analysis, and the Commonwealth Court, on remand, correctly engaged in an independent review of the enabling statutes to determine if the relevant legislative intent was therein expressed.[8]

## B.

We next address Appellants' arguments that are reflected in Judge Pellegrini's dissent. Appellants adopt an approach that focuses on the core functions of the respective entities. This reliance on the core functions of SEPTA and the City, and Judge Pellegrini's distinction between an "authority" providing a service and a municipality with governing authority, essentially turns the status-based analysis of the Commonwealth Court in SEPTA II on its head. Instead of prioritizing

8. Similarly, contrary to Appellants' assertions, the SEPTA III majority did not reject Chief Justice Castille's analysis of the legislative intent. His position that Ogontz should not apply beyond its facts was not agreed to by the majority, but the majority did not reach or opine on whether or not legislative intent was clear in the language of the statutes. The Court instead remanded for the Commonwealth Court to address the issue in the first instance, under the proper standard. As such, at most, the majority position was that Chief Justice Castille's analysis was premature. See SEPTA III, 101 A.3d at 87–88.

Commonwealth agencies over municipalities absent an express contrary intent by the legislature, Appellants would prioritize based on the governing versus the service-providing function of the respective entities. This is merely a different version of the status-based approach we rejected in SEPTA III. "In a series of cases beginning with our decision in Ogontz, *supra*, this Court has held that a Commonwealth agency's challenge to a municipality's exercise of authority over it does not represent a contest between superior and inferior governmental entities, but instead a contest between two instrumentalities of the state." Id. at 87 (quoting Ogontz, 483 A.2d at 452) (other citations omitted). The considerations reflected in Appellants' arguments may be relevant in the performance of the second part of the Ogontz analysis, if necessary, but are not indicative of the legislature's intent in the first part, which focuses on the language of the pertinent statutes. *See* id.

## C.

We turn then, to our de novo review of the authorizing statutes to discern if the legislature has expressed an intent to exempt SEPTA from enforcement of the FPO. Reviewing the legislation establishing the City's authority under Home Rule and the legislation creating SEPTA, we note several facts are undisputed. Respecting SEPTA, it is clear the MTAA provides that SEPTA exercises its public powers as an agency of the Commonwealth. 74 Pa.C.S. § 1711(a). It is equally undisputed that the MTAA extends sovereign immunity to SEPTA. Id. at § 1711(c) (referencing 1 Pa.C.S. § 2310, which states that sovereign immunity continues until "specifically waived" by the General Assembly); *see also* Frazier v. W.C.A.B. (Bayada Nurses, Inc.), 616 Pa. 592, 52 A.3d 241 (2012) (holding subrogation claim against SEPTA under the Workers Compensation Act was barred on the basis of sovereign immunity).

The authority of the City to enact the FPO and to enforce its provisions within Philadelphia is also not contested. That authority stems from the FCCHRA, which grants broad powers to the City to legislate in any non-prohibited field pertinent to its municipal functions. *See* 53 P.S. §§ 13101–13157.

Additionally, the PHRA specifically provides that its provisions do not interfere with the authority of a municipality to pass appropriate ordinances and enforce anti-discrimination provisions concurrently with the State Commission. *See* 43 P.S. § 962(a), (b).

As recognized by the Commonwealth Court majority, these clear provisions show the legislature intended to shield SEPTA from entities initiating suits against it. The general authority of the City to legislate in this area, simply does not address the issue of its jurisdiction over SEPTA. In contrast, the sovereign immunity provisions do create an express limitation on any entity in bringing suit against SEPTA. We recognize that the legislature specifically waived sovereign immunity for Commonwealth agencies for purposes of enforcement of the PHRA. 43 P.S. § 954. It does not follow that the waiver of immunity piggybacks to the FPO merely because local municipalities are permitted to exercise concurrent enactment and enforcement authority with the State Commission with respect to the subject matter at issue. Rather, Section 954 is an explicit expression of the legislature's intent to grant the State Commission exclusive jurisdiction over Commonwealth agencies in anti-discrimination matters. As noted above, any waiver of sovereign immunity must be specifically enacted by the legislature. 1 Pa.C.S. § 2310. No such waiver appears in the City's Home Rule authorization or SEPTA's enabling legislation. The fact that the FPO has an array of enforcement options does not provide a basis to infer the legislature intended only a partial exemption. As SEPTA suggests, this would require a selective reading of the FPO.[9]

In conclusion, the Commonwealth Court did not err in its determination that, under the first prong of the Ogontz analysis, the statutory language and legislative scheme of the

9. Our holding does not do harm to our deference to the State Commission in matters of statutory interpretation under its purview. First, such deference must give way to clear language of the legislature. Com., Office of Admin. v. Pennsylvania Labor Relations Bd., 591 Pa. 176, 916 A.2d 541, 550 (2007). Second, the source of the statutory language evidence the General Assembly's intent on this issue stems from the MTAA, over which the PHRA has no interpretive function.

enabling legislation disclosed the legislature's intent to exclude SEPTA from the jurisdiction of the FPO. We, therefore, affirm the order of the Commonwealth Court.

Chief Justice Saylor and Justice Baer join the opinion.

Chief Justice Saylor and Justice Wecht file concurring opinions.

Justice Donohue files a dissenting opinion in which Justices Todd and Dougherty joins.

CHIEF JUSTICE SAYLOR, Concurring

I join the lead opinion, subject to the proviso that I agree with Justice Wecht's comments about the relevant analytical framework. In this respect, I also note that sometimes, the mechanical formulation and heralding of a specific test—such as what the Court has dubbed the *"Ogontz* test"—has unintended consequences.

Here, I agree with Justice Wecht, that the "Ogontz test" reflects nothing more than a conventional application of principles of statutory construction. As such, and since the discrete, tiered analysis appears to be generating disharmony, I would prefer to abandon the label at this juncture. In its place, I would simply refer directly to the Statutory Construction Act.

JUSTICE WECHT, Concurring

I concur in the result reached by the learned opinion announcing the judgment of the Court ("OAJC"). I write separately to endorse an alternative application of the *Ogontz* test. *See Commonwealth, Dep't of Gen. Servs. v. Ogontz Area Neighbors Ass'n*, 505 Pa. 614, 483 A.2d 448 (1984) (*"Ogontz"*).

In *SEPTA v. City of Philadelphia*, 627 Pa. 470, 101 A.3d 79, 88 (2014) (*"SEPTA III"*), this Court recognized that, where a Commonwealth agency challenges a municipality's exercise of authority, the *Ogontz* test applies to resolve the conflict between the two instrumentalities of the state. *See Ogontz*, 483 A.2d at 452 (holding that conflict between Commonwealth agency and municipality is "not a contest between superior

and inferior government entities, but instead a contest between two instrumentalities of the state."). We have explained the test as follows:

The first step requires the reviewing court to determine, through examination of the statutes, which governmental entity, if any, the General Assembly expressly intended to be preeminent .... In the event there is no such express legislative mandate, the second step requires the court "to determine legislative intent as to which agency is to prevail ... turn[ing] to the statutory construction rule that legislative intent may be determined by a consideration, *inter alia*, of the consequences of a particular interpretation."

*Hazleton Area Sch. Dist. v. Zoning Hearing Bd.*, 566 Pa. 180, 778 A.2d 1205, 1210 (2001) (quoting *Ogontz*, 483 A.2d at 455) (citations omitted). This two-part test embraces the process of statutory construction, with which this Court is deeply familiar. We look first to the legislation's plain language. If that language is ambiguous, we apply other principles embodied in our rules of statutory construction, which include a consideration of "[t]he consequences of a particular interpretation." 1 Pa.C.S. § 1921.

In my view, the first prong of the *Ogontz* test requires the Court to look to the language of the enabling statutes of both SEPTA and the City of Philadelphia in order to determine only whether the General Assembly included in either statute an express statement that one entity or the other has priority in the event of a conflict. In this case, we would review the Metropolitan Transportation Authorities Act ("MTAA"), 74 Pa.C.S. §§ 1701–85, and the First Class City Home Rule Act ("Home Rule Act"), 53 P.S. §§ 13101–157, for a statement such as "SEPTA is exempt from local regulations," or "Philadelphia may exercise jurisdiction over entities created by an act of the Commonwealth." Because the statutes offer no such language, the first prong of the Ogontz test is inconclusive.

I respectfully disagree with the OAJC's conclusion that the sovereign immunity provision contained in the MTAA, 74 Pa.C.S. § 1711(c)(3), represents an explicit statement that SEPTA has priority over Philadelphia in the area of anti-

discrimination legislation under the first prong of *Ogontz*. The OAJC agrees that "neither enabling statute contain[s] an explicit provision directly addressing the issue," but concludes that the lack of an express directive, "[does] not preclude the possibility that an examination of the statutes as a whole [can] reveal such a clear intent." Maj. Op. at 17, 159 A.3d at 452.[1] I believe that the comparative assessment of the statutory scheme "as a whole" should occur at the second stage of the analysis. Otherwise, the inclusion of a sovereign immunity provision in an entity's enabling statute would always give the entity priority over a local authority as to any type of local regulation, an outcome this Court expressly rejected in *SEPTA III*, 101 A.3d at 89 n.13 ("[W]hen presented with two competing absolutes—here sovereign immunity and the authority of Philadelphia to enforce its ordinance, we employ the tools of statutory construction and interpretation to resolve the conflict."). As explained in greater detail below, I believe that SEPTA's priority in this particular scenario stems from the fact that the local regulation in question, the Philadelphia Fair Practices Ordinance ("FPO"), directly undermines the General Assembly's intention to shield SEPTA from the hazards of litigation.

The second *Ogontz* prong requires the Court to assess the consequences of each party's proffered interpretation of the statutes. Although particular circumstances may require the development of a factual record in order to apply the second prong, this is not necessary in every case. For instance, in *Ogontz* itself, this Court considered the consequences of allowing the Commonwealth to build a mental health facility on Commonwealth property in contravention of a local zoning ordinance. The Court concluded as a matter of law that allowing the facility to be built in the proposed location, a residential zone, would frustrate the purpose of the local law, while upholding the zoning ordinance would not prohibit the

1. The OAJC explains that the first step in the *Ogontz* analysis "requires an examination of the overall language of the legislation to discern if the General Assembly expressly intended one [entity] or the other to be preeminent." Maj. Op. at 17, 159 A.3d at 452. The OAJC's review of the legislation's "overall language" under the first prong of *Ogontz* could be interpreted as an attempt to ascertain the implied intent of the General

Commonwealth from constructing the facility elsewhere. The Court did not need a developed factual record to assess these consequences and to reach the conclusion that enforcing the zoning ordinance caused less disruption to each statutory scheme.

Likewise, in the present case, we can apply the second prong of *Ogontz* without remanding the case for fact-finding. We can evaluate the purely legal consequences of each party's suggested interpretation of the MTAA and the Home Rule Act, which includes an appraisal of their overall statutory schemes. With regard to Philadelphia's argument that SEPTA's core transportation function will not be upset by requiring it to comply with the FPO, we need not consider how much it will cost SEPTA to comply with the ordinance and to defend itself from claims of discrimination. Rather, we can look to the MTAA's provisions and ascertain the extent to which those provisions would be upset by subjecting SEPTA to the FPO. Similarly, we can consider the effect that exempting SEPTA from the FPO will have on Philadelphia's Home Rule authority and the efficacy of the FPO.

By including Subsection 1711(c)(3) in the MTAA,[2] the General Assembly expressed its will to shield SEPTA from most types of lawsuits, absent a specific waiver, ostensibly so that SEPTA could provide public transportation without enduring the financial and temporal costs of litigation. *See Sci. Games Int'l, Inc. v. Commonwealth*, 620 Pa. 175, 66 A.3d 740, 755 (2013) ("The constitutionally-grounded, statutory doctrine of sovereign immunity obviously serves to protect government

Assembly rather than its expressed intent, as the first step of *Ogontz* requires.

**2.** Subsection 1711(c)(3) provides as follows:

It is hereby declared to be the intent of the General Assembly that an authority created or existing under this chapter, including any authority established under the former provisions of Article II2 of the Pennsylvania Urban Mass Transportation Law or the former provisions of Chapter 15, and the members, officers, officials and employees of any of them, shall continue to enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver), and shall remain immune from suit except as provided by and subject to the provision of 42 Pa.C.S. §§ 8501 (relating to definitions) through 8528 (relating to limitations on damages).

74 Pa.C.S. § 1711(c)(3)

policymaking prerogatives and the public fisc."); *Mullin v. Commonwealth, Dep't of Transp.*, 582 Pa. 127, 870 A.2d 773, 779 (2005) ("[I]mmunity provisions were enacted to insulate the Commonwealth and its agencies from liability except in certain specified circumstances, so that state governmental revenues are not subject to unnecessary depletion.") (citation omitted); *Stackhouse v. Commonwealth, Pa. State Police*, 892 A.2d 54, 62 (Pa. Cmwlth. 2006) ("The purpose of absolute sovereign immunity [is] to insulate state agencies and employees not only from judgments but also from being required to expend the time and funds necessary to defend suits."). Were we to interpret the FPO to apply to SEPTA with full force, we would frustrate the General Assembly's intent that SEPTA be subject to only certain types of litigation, inasmuch as the FPO provides for an individual private right of action accompanied by damage awards. *See* Phila. Code § 9–1122.

Conceding that the MTAA's sovereign immunity provision bars individuals from bringing private suits against SEPTA, Philadelphia claims that it nonetheless may selectively enforce the FPO against SEPTA by seeking only injunctive and collaborative remedies. However, even such selective enforcement involves administrative investigations and hearings, which may result in cease and desist orders, injunctive relief, attorneys' fees, and costs for expenses incurred by the Philadelphia Commission on Human Relations ("the Commission"). *See* Phila. Code § 9–1107. The FPO also establishes criminal penalties for non-compliance with orders of the Commission. Phila. Code § 9–1121(1)–(2). Although these latter proceedings and remedial orders may not result from a lawsuit or implicate damage awards,[3] they nonetheless present the burdens associated with litigation that the General Assembly sought to preclude by granting SEPTA sovereign immunity.[4] The inclu-

3. Such proceedings may fall outside the scope of sovereign immunity. *See Wilkinsburg Police Officers Ass'n v. Commonwealth*, 535 Pa. 425, 636 A.2d 134, 137 (1993) ("[S]uits which simply seek to restrain state officials from performing affirmative acts are not within the rule of immunity.").

4. *Cf.* Dissenting Op. at 37, 159 A.3d at 465 ("SEPTA is obliged to participate in these processes including attendance at mediations and

sion of a sovereign immunity provision in SEPTA's enabling statute, in the absence of any other relevant statutory language, evinces the legislative will to minimize SEPTA's litigation-related burden. The question presented in this case is whether the General Assembly intended that Philadelphia exercise authority over SEPTA in the manner prescribed by the FPO. Selective enforcement or severability of the FPO is impossible because the General Assembly has either given Philadelphia such authority or it has not.

Even if Philadelphia's enforcement of the FPO was limited to prohibitory injunctive relief, Philadelphia nonetheless constructively could usurp SEPTA's authority over its core transportation mission and burden SEPTA substantially. For example, SEPTA might plan to change its routing to severely diminish services to a particular neighborhood with an unusually high concentration of riders protected by the FPO but not protected by the Pennsylvania Human Relations Act ("PHRA"). Absent some legal bar, Philadelphia then could seek a prohibitory injunction alleging discrimination based upon the disparate provision of services. Under the FPO, Philadelphia, if it prevailed, could obtain an injunction preventing SEPTA from rerouting or rescheduling certain buses or trains away from that neighborhood, effectively telling SEPTA how to fulfill its mandate.[5] Thus, subjecting SEPTA to the FPO would undermine the MTAA. The MTAA, and partic-

conciliations in furtherance of the relief sought, and compliance with investigative subpoenas . . . ."). I do not suggest that sovereign immunity extends beyond suits for damages, recovery of property, or mandatory injunctive relief. I do conclude, based upon the General Assembly's express will that SEPTA not be subjected to litigation—as evinced by the inclusion of Subsection 1711(c)(3)—that exempting SEPTA from the FPO is more consistent with the General Assembly's intent than subjecting SEPTA to the FPO.

**5.** The Dissent notes that an order to correct existing underservice would require a mandatory injunction, which clearly would be defeated by SEPTA's sovereign immunity. Dissenting Op. at 38–39 n.6, 159 A.3d at 466 n.6. By contrast, the remedy hypothesized above describes a prohibitory injunction issued to prevent a diminution in service, a remedy that falls outside the realm of sovereign immunity but that necessarily impinges upon SEPTA's ability to make transportation-related decisions. The same can be said of other FPO remedies such as conciliation agreements or cease-and-desist orders.

ularly its sovereign immunity provision, evinces the General Assembly's intent to allow SEPTA to avoid litigation, an intent that would be frustrated if SEPTA is subjected to the jurisdiction of the Commission under the FPO.[6]

The learned Dissent maintains that the PHRA reveals some policy on the part of the General Assembly to disfavor all types of discriminatory conduct, not just those enumerated in that statute, and that "SEPTA's core mission is to provide public transportation without engaging in discriminatory conduct." Dissenting Op. at 38, 159 A.3d at 465 (emphasis removed). The Dissent goes on to argue that SEPTA impliedly is prohibited from discriminating against those classes protected by the FPO but not by the PHRA because "[n]o language in any of the relevant legislation suggests any intent by the General Assembly to permit SEPTA to engage" in such discrimination. *Id.* at 38, 159 A.3d at 466. No legal authority supports this prohibition-by-implication approach to statutory interpretation. We are bound to glean the General Assembly's intent from its words when those words are clear. In unmistakable terms, the PHRA protects from discrimination only those classes enumerated therein. *Expressio unius est exclusio alterius.*[7]

6. The Dissent contends that I "insist[ ] that SEPTA's sovereign immunity makes [compliance with the FPO] functionally impossible." Dissenting Op. at 33, 159 A.3d at 463. I do not. It is entirely possible for SEPTA to be subjected to the FPO. But this is for the General Assembly to do by legislation rather than for this Court to do by judicial lawmaking. Nothing precludes the legislature from acting. The General Assembly's codification of SEPTA's sovereign immunity does not suggest any current legislative inclination to subject SEPTA to the quasi-litigation scheme imposed by the FPO. Nor do I "attempt[ ] to expand the protections of sovereign immunity exponentially," as the Dissent asserts. *Id.* Expansion and contraction are legislative functions. I interpret the law based upon the available evidence of the General Assembly's intent. I recognize and understand the limits of sovereign immunity as discussed by the Dissent. It is emphatically not my position that sovereign immunity, in and of itself, expressly prevents application of the FPO. Were that my belief, I would join the OAJC, and decide this appeal based upon the MTAA's plain language. I conclude only that the General Assembly did not intend here to subject SEPTA to the jurisdiction of a Philadelphia administrative body when it exempted SEPTA from litigation by conferring sovereign immunity upon it.

7. *See Atcovitz v. Gulph Mills Tennis Club, Inc.,* 571 Pa. 580, 812 A.2d 1218, 1223 (2002) ("[U]nder the doctrine of *expressio unius est exclusio*

The Dissent correctly interprets my position as "amount[ing] to an assertion that the General Assembly intended to require SEPTA to comply with some anti-discrimination laws (*i.e.*, those in the PHRA relating to discrimination based upon, *inter alia*, race, color, religious creed, ancestry, age or sex, 43 P.S. § 956(a)), but to be free from any obligation to comply with other anti-discrimination laws (*i.e.*, those in the FPO relating to discrimination based upon, *inter alia*, gender identity or sexual orientation, Phila. Code § 9–1103(1))." *Id.* at 38, 159 A.3d at 466. I am compelled to draw that conclusion because I fail to see how we can take the liberty of inferring any other legislative intent. Speaking generally, and relative to the instant context, state action that is not prohibited by the federal or state constitution, or by binding statute or precedent, necessarily is permitted.[8] In the PHRA, the General Assembly affirmatively chose to prohibit certain types of discrimination while affirmatively declining to prohibit others.

The deliberation behind the General Assembly's conspicuous omission of protections for those discriminated against based upon gender identity and sexual orientation is thrown into stark and glaring relief when viewed in a national context. Numerous other states have enacted legislation that, in relevant part, differs from our own PHRA only in the particular that, like Philadelphia's FPO and markedly unlike Pennsylvania's PHRA, these states prohibit discrimination on the basis

*alterius*, the inclusion of a specific matter in a statute implies the exclusion of other matters."). As Justice Harlan observed in the federal context:

[When] the question relates to matters of public policy ... Congress alone can deal with the subject; [a] court would encroach upon the authority of Congress if, under the guise of construction, it should assume to determine a matter of public policy .... [The opponents of a statute] must go to Congress and obtain an amendment ... if they think [it wrong] .... [T]his court cannot and will not judicially legislate, since its function is to declare the law, while it belongs to the legislative department to make the law.

*Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 102, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

8. No constitutional claim has been made in this case. Importantly, SEPTA would remain subject to federal and state anti-discrimination laws such as Title VII and the PHRA, as discussed herein.

of gender identity and sexual orientation.[9] This distinction cannot have been lost upon our legislature, which as recently as 2015 has considered and declined to pass proposed legislation that would bring Pennsylvania into step with those states that have added the LGBT community to the classes protected against discrimination.[10] This Court may not override that choice by seeking to improve upon or read into the PHRA what cannot fairly be inferred under our rules of statutory construction.[11] Absent further developments in constitutional or federal law, only our General Assembly has the power to align Pennsylvania with Philadelphia and our numerous sister states that have chosen to provide legal protections to persons

**9.** Unlike Pennsylvania, the following states and the District of Columbia have enacted laws that prohibit discrimination based upon sexual orientation and gender identity: California (Cal. E. Code § 1101; Cal. Civ. Code § 51 *et. cet.*), Colorado (C.R.S. 24–34–402; 24–34–601), Connecticut (Conn. Gen. Stat. §§ 46a–60, 46a–64), Delaware (Del. S.B. 121 (2009); Del. S.B. 97 (2013)), District of Columbia (D.C. Code §§ 2–1402.11, 2–1402.31), Hawaii (Haw. Rev. Stat. §§ 378–2, 489–3), Illinois (775 ILCS 5/2–102 (2005)), Iowa (Iowa Code §§ 216.86, 216.6a, 216.7 (2007)), Maine (5 Me. Rev. Stat. §§ 4571, 4572, 4591, 4592 (2005)), Maryland (Md. S.B. 212 (2014)), Massachusetts (Mass. Gen. Laws, ch. 151B, § 4, ch. 272, § 92A (1989)), Minnesota (Minn. Stat. §§ 363A.08, 363A.11 (1993)), Nevada (Nev. A.B. 311 (1999); Nev. A.B. 211 (2011); Nev. S.B. 207 (2009); Nev. S.B. 331 (2011)), New Hampshire (N.H. H.B. 421 (1997)), New Jersey (N.J. Stat. §§ 10:5–4, 10:5–12), New Mexico (N.M. Stat. Ann. § 28–1–7), New York (N.Y. S.B. 720 (2002)), Oregon (Or. S.B. 2 (2007)), Rhode Island (R.I. Gen. Laws. §§ 11–24–2, 28–5–7), Utah (Utah S.B. 296 (2015)), Vermont (9 Vt. Stat. § 4502; 21 Vt. Stat. § 495), Washington (Wash. Rev. Code §§ 49–60–180, 49–60–215 (2006)), Wisconsin (Wis. Stat. §§ 106.52, 111.321, § 111.322, § 111.36 (1982)).

**10.** *See* House Bill 1510 (2015) ("Pennsylvania Fairness Act") (referred to State Government Committee) (proposed amendment to PHRA to prohibit discrimination based on sexual orientation, gender identity or gender expression); *see also* Claire Sasko, *Why Pennsylvania's Hate Crime Laws Still Lack LGBT Protections*, Phila. Mag., June 21, 2016, http://M1Fwww.phillymag.com/news/2016/06/21/pennsylvania-hate-crime-laws/ (reporting that Pennsylvania Fairness Act stalled in the House State Government Committee because the majority chairman considered the bill " 'dangerous' and that debate on the issue is 'futile' because he believes the bill will not win [a legislative] majority") (last reviewed Mar. 22, 2017).

**11.** As Justice Oliver Wendell Holmes, Jr. wrote, "[I]f my fellow citizens want to go to Hell I will help them. It's my job." Letter from Oliver Wendell Holmes, Jr., to Harold J. Laski, (Mar. 4, 1920), *in Holmes–Laski Letters*, at 249 (Mark DeWolfe Howe ed., vol. 1) (1953).

who suffer discrimination on the basis of their gender identity or sexual orientation.

Returning to the issue at bar, while subjecting SEPTA to the FPO is at odds with the MTAA's sovereign immunity provision, prohibiting Philadelphia from exercising jurisdiction over SEPTA under the FPO would not upset Philadelphia's local authority or the purposes of the FPO generally. Philadelphia's contention that SEPTA—as the city's largest transportation provider—is a major public accommodation and target of the FPO is well taken. However, it is hardly the only public accommodation in the city. Our ruling does not prohibit Philadelphia from enforcing the FPO against any number of public and private entities that serve the public. As in *Ogontz*, where we explained that the Commonwealth could effectuate its goal by constructing the mental health facility in a different location, Philadelphia can carry out the purpose of the FPO by enforcing it against numerous other individuals and entities located within the city.[12]

Comparing the consequences of each party's proffered interpretation of the statutes, SEPTA's interpretation more effectively harmonizes the MTAA and Philadelphia's Home Rule Authority to enforce the FPO. As the OAJC emphasizes, the sovereign immunity provision expressly limits any entity from bringing suit against SEPTA. Maj. Op. at 19, 159 A.3d at 454. Although sovereign immunity does not prohibit any and all local regulation of SEPTA, in purporting to subject SEPTA to an administrative scheme that mimics the rigors of litigation, the FPO contradicts the General Assembly's choice to immunize SEPTA from suit.

12. I agree with the Dissent that "[t]he aim of the FPO is not to protect some, but rather all, Philadelphians from the types of discrimination identified in the ordinance." Dissenting Op. at 39, 159 A.3d at 466. I agree as well with the Dissent's conclusion that the General Assembly has "cede[d] local control over the extension of protections against discrimination for additional categories of citizens." Dissenting Op. at 36, 159 A.3d at 464. Our decision in this case will leave all Philadelphians protected by the FPO, including "additional categories of citizens"—except when SEPTA is the entity alleged to be discriminating, because the General Assembly has not ceded local control over SEPTA. Elimination of this patent discrepancy is the prerogative of the legislature, not the judiciary.

Finally, like the OAJC, I reject Philadelphia's claim that the PHRA waives SEPTA's sovereign immunity as to claims brought under the FPO. It is well-established and undisputed that sovereign immunity must be waived specifically by the General Assembly, 1 Pa.C.S. § 2310 ("[T]he Commonwealth ... shall ... remain immune from suit except as the General Assembly shall specifically waive the immunity ...."), and that we must construe exceptions to sovereign immunity narrowly. *See Dean v. Dep't of Transp.*, 561 Pa. 503, 751 A.2d 1130, 1132 (2000) ("[T]he exceptions to immunity are to be strictly construed."). Notably, the PHRA specifically waives sovereign immunity for claims brought before the Pennsylvania Human Relations Commission ("PHRC"). *See* 43 P.S. § 954(a) (defining "person" to include "the Commonwealth of Pennsylvania, and all political subdivisions, authorities, boards and commissions thereof"); 43 P.S. § 954(b) (defining "employer" to include "the Commonwealth or any political subdivision or board, department, commission or school district thereof"). The PHRA also provides that "[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission," 43 P.S. § 962.1(a), and that "legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the [PHRC] under the provisions of [the PHRA]." 43 P.S. § 962.1(d). Philadelphia argues that, by granting local authorities "powers and duties similar to those" of the PHRC, the General Assembly effectively expanded the PHRA's waiver of sovereign immunity to the FPO and PHRC. However, the language of Section 962.1 does not speak specifically to waiver of sovereign immunity. As I read and consider Section 962.1, I am unable to discern the specific and clear language required to allow for importing the PHRA's waiver to the jurisdiction of local authorities. Should the General Assembly wish to enact such language, it may do so. We may not engraft such language onto a statute that lacks it through an act of judicial fiat.

As I survey the statutory landscape, I do not find the lawmakers' express will that SEPTA be subject to Philadelphia's jurisdiction under the FPO or equivalent local regulations. Similarly, I cannot locate any legislative mandate to exempt SEPTA from all forms of local regulation. The statutes are ambiguous. Accordingly, to ascertain the General Assembly's intent, we are constrained to fall back upon our familiar rules of statutory construction. Relying upon *Ogontz*'s formulation, I conclude that the intent of the General Assembly to shield SEPTA from litigation by granting it sovereign immunity is incompatible with subjecting SEPTA to Philadelphia's FPO. On this basis, I would affirm the order of the Commonwealth Court prohibiting Philadelphia from enforcing the FPO against SEPTA.

### JUSTICE DONOHUE, Dissenting

In my view, proper application of the two-part test set forth in *Commonwealth, Dep't of Gen. Servs. v. Ogontz Area Neighbors Ass'n*, 505 Pa. 614, 483 A.2d 448 (1984), reveals the Legislature's intent to subject SEPTA to the jurisdiction of the Philadelphia Commission on Human Relations ("Philadelphia Commission") and to the Philadelphia Fair Practices Ordinance ("FPO"). The opinion announcing the judgment of the Court ("OAJC"), pursuant to its interpretation and analysis of *Ogontz*'s first analytic prong, reaches a contrary conclusion. Justice Wecht, based upon an analysis of *Ogontz*'s second analytic prong, also finds that SEPTA is exempt from the anti-discrimination provisions of the FPO. Both the OAJC and Justice Wecht's Concurrence reach their conclusions based upon SEPTA's sovereign immunity, but in so doing overstate the scope and breadth of the protections that sovereign immunity provides. Properly understood, sovereign immunity poses no obstacle to subjecting SEPTA to the jurisdiction of the Philadelphia Commission in all cases not seeking monetary damages or mandatory injunctive relief.[1] Accordingly, I respectfully dissent.

1. A mandatory injunction commands the performance of some positive act while a prohibitory injunction enjoins the performance of an act.

I join in Justice Wecht's discussion of the analytic framework required by *Ogontz*. *Ogontz*'s first analytic prong requires the Court in this case to look to the language of the Metropolitan Transportation Authorities Act ("MTAA") and the First Class City Home Rule Act ("Home Rule Act")— SEPTA's and the Philadelphia Commission's enabling statutes, respectively—to determine whether either contains an express statement that one entity or the other has priority in the event of a conflict. Concurring Op. (Wecht, J.) at 21–22, 159 A.3d at 455–56. As the Concurrence explains, no express statement exists in either act, making the first prong of the *Ogontz* test inconclusive. *Id.*

I likewise agree that the OAJC's examination of the first prong erroneously extended beyond consideration of the enabling legislation to the statutory language of the Pennsylvania Human Relations Act ("PHRA"). 43 P.S. § 954(b). Moreover, and more importantly, I disagree with the OAJC's analysis of that statutory language. Pursuant to the MTAA, SEPTA is a Commonwealth agency and has sovereign immunity. 74 Pa.C.S.A. § 1711(a), (c)(3). As a Commonwealth agency, however, SEPTA has no sovereign immunity with respect to compliance with the PHRA. 43 P.S. § 954. SEPTA is thus within the jurisdiction of the Pennsylvania Human Relations Commission ("PHRC") and subject to the PHRA's anti-discrimination provisions, which forbid various forms of discrimination, including discrimination based upon race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability. 43 P.S. §§ 955, 956(a). In contrast, the FPO provides additional anti-discrimination protections, including, inter alia, discrimination based upon gender identity, sexual orientation, ethnicity or marital status. Phila. Code § 9-1103(1).[2]

See generally *Mazzie v. Commonwealth*, 495 Pa. 128, 432 A.2d 985, 988 (1981).

**2.** The Home Rule Act grants broad powers to Philadelphia to legislate with respect to its municipal functions. *See* 53 P.S. §§ 13101–13157. It is not contested that Philadelphia is permitted to legislate in the field of anti-discrimination law.

According to the OAJC, "[s]ection 954 is an explicit expression of the legislature's intent to grant the State Commission exclusive jurisdiction over Commonwealth agencies in anti-discrimination matters." *Id.* I cannot agree, as in my view an "explicit expression" of the legislature's intent for the PHRC to have exclusive jurisdiction over Commonwealth agencies in anti-discrimination matters would include some language to that effect. The PHRA does not provide for the exclusive jurisdiction of the PHRC in anti-discrimination matters involving Commonwealth agencies. If the legislature had so intended, it could have said, simply, "the PHRC has exclusive jurisdiction over Commonwealth agencies in anti-discrimination matters," or words to that effect. It did not do so. A directive that Commonwealth agencies are subject to the jurisdiction of the PHRC does not imply that they are not subject to the jurisdiction of any other tribunals. The totality of legislative intent in this regard is that SEPTA, as a Commonwealth agency, must comply with the PHRA. That point, however, is neither controversial nor relevant to whether SEPTA is also subject to the jurisdiction of the Philadelphia Commission.

*Ogontz*'s second analytic prong requires the Court to assess the consequences of subjecting SEPTA to the FPO and, conversely, of prohibiting the Philadelphia Commission from enforcing the FPO against SEPTA. With respect to subjecting SEPTA to compliance with the FPO, Justice Wecht's Concurrence insists that SEPTA's sovereign immunity makes this functionally impossible. Concurring Op. (Wecht, J.) at 22, 159 A.3d at 456. The Concurrence bases this conclusion on an extremely broad view of the scope of the protections afforded by sovereign immunity. This Court has repeatedly held that sovereign immunity acts as a shield against lawsuits in two discrete circumstances: those seeking money damages or the recovery of property, and those requesting mandatory injunctive relief to compel affirmative actions. *See, e.g., Fawber v. Cohen*, 516 Pa. 352, 532 A.2d 429, 433–34 (1987). Conversely, sovereign immunity does not shield Commonwealth agencies from lawsuits seeking declaratory relief or prohibitory injunc-

tive relief, *Legal Capital, LLC v. Medical Prof. Liab. Catastrophe Loss Fund*, 561 Pa. 336, 750 A.2d 299, 302–03 (2000), or bar actions in mandamus to require a state agency to perform a ministerial or mandatory statutory duty. *Finn v. Rendell*, 990 A.2d 100, 105 (Pa. Commw. 2010); *Kee v. Pa. Tpk. Comm'n*, 685 A.2d 1054, 1059 (Pa. Commw. 1996).

Justice Wecht, however, attempts to expand the protections of sovereign immunity exponentially, contending (without citation to any statutory language) that the General Assembly, in providing SEPTA with sovereign immunity, intended to shelter SEPTA from having to incur "financial and temporal costs of litigation." Concurring Op. (Wecht, J.) at 23, 159 A.3d at 456. According to the Concurrence, the legislative intent in granting sovereign immunity to SEPTA was to shield it from the rigors of discrimination litigation generally, outside of the PHRC context. *Id.* at 24 n.4, 159 A.3d at 457 n.4 (stating that the General Assembly indicated its "express will that SEPTA not be subjected to litigation"). The Concurrence thus claims that SEPTA's protection from complaints brought before the Philadelphia Commission for alleged violations of the FPO must be complete, and thus to effectuate the "legislative will to preclude subjecting SEPTA to local administrative proceedings of whatever nature," Justice Wecht concludes that the Philadelphia Commission may not be permitted to exercise jurisdiction over SEPTA at all—including jurisdiction over claims for which SEPTA's sovereign immunity offers it no protection. *Id.*

The Concurrence's legislative intent argument rests on an extremely broad view of the protections afforded by sovereign immunity, and one not grounded in our prior decisions defining the scope of the doctrine. Contrary to Justice Wecht's contention, a grant of sovereign immunity carries no concomitant privilege to be free of all costs of litigation. It is true that in cases that fall within the protections of sovereign immunity, litigation expenses may be kept to a minimum, as these claims may be dismissed at the outset. Justice Wecht cites to two such cases: *Sci. Games Int'l, Inc. v. Com.*, 620 Pa. 175, 66 A.3d 740 (2013) and *Mullin v. Commonwealth, Dept. of*

*Trans.*, 582 Pa. 127, 870 A.2d 773 (2005).[3] The Concurrence cites to no Pennsylvania case, however, holding that sovereign immunity protects its holder from the "financial and temporal costs of litigation" in cases where the doctrine does **not** provide its holder with immunity from suit.

The Concurrence likewise directs us to no statutory language in the MTAA stating, or even suggesting, that by granting sovereign immunity, the legislature also intended to preclude local administrative bodies from exercising jurisdiction over SEPTA. Section 1171(c)(3) of the MTAA, the provision granting sovereign immunity to SEPTA, provides no exclusions from the jurisdiction of any tribunal, including but not limited to no exclusions from the jurisdiction of local administrative bodies like the Philadelphia Commission. Without any mention of any jurisdictional exceptions, section 1171(c)(3) merely states that authorities created under the MTAA and their members, officials, officers and employees "shall continue to enjoy sovereign and official immunity." 74 Pa.C.S. § 1171(c)(3). The grant of sovereign immunity is entirely irrelevant to the issue of whether the PHRC has exclusive **jurisdiction** over Commonwealth agencies like SEPTA.[4]

**3.** The Concurrence also cites to a Commonwealth Court decision, *Stackhouse v. Com., Pennsylvania State Police*, 892 A.2d 54 (Pa. Commw. 2006), that involved a request for declaratory relief. The trial court dismissed it on preliminary objections based upon sovereign immunity. The Commonwealth Court affirmed, concluding that the request for a declaration of rights was sought only to provide "the legal predicate for a damage or other immunity-barred claim." *Id.* at 62.

**4.** Sovereign immunity is an affirmative defense to liability, and by rule it must be raised in new matter. Pa.R.C.P. 1030; *Brimmeier v. Pennsylvania Tpk. Comm'n*, 147 A.3d 954, 960 (Pa. Commw. 2016). Importantly, the availability of sovereign immunity as a defense does not go to the jurisdiction of the tribunal. *Chem. Nat. Res., Inc. v. Republic of Venezuela*, 420 Pa. 134, 215 A.2d 864, 867 (1966) ("Sovereign immunity is in the nature of an affirmative defense; (a) it does not go to jurisdiction and (b) it can be waived."). When a plaintiff asserts a cause of action that falls within a defendant's sovereign immunity defense, the tribunal does not lack personal jurisdiction over the defendant or subject matter jurisdiction over the defendant's claim. Instead, the tribunal must dismiss the claim because, as a matter of law, the defendant is immune from liability for the cause of action in question. Justice Wecht's conclusion that the availability of the sovereign immunity defense

Justice Wecht also contends that the General Assembly's decision not to amend the PHRA to include anti-discrimination protections for, inter alia, gender identity and sexual orientation, at the state-wide level evinces a legislative intent not to require Commonwealth agencies to comply with local regulations that do contain these protections. This reliance on the General Assembly's silence, however, is misguided, as it reflects nothing more than the legislature's intention to cede to local control over the extension of protections against discrimination for additional categories of citizens. In declining to amend the PHRA, the legislators were well aware that local ordinances providing additional anti-discrimination protections existed in various political subdivisions throughout Pennsylvania, including in Philadelphia. If the General Assembly had any intention to preclude Commonwealth agencies from abiding by such protections in local ordinances, or to confer to the PHRC exclusive jurisdiction over Commonwealth agencies with respect to anti-discrimination matters, it certainly could have amended the PHRA to do so.[5] Instead, the General Assembly has not passed any legislation usurping the power of political subdivisions to enact and enforce anti-discrimination provisions beyond those set forth in the PHRA.

The only legislative intent that may be properly gleaned from SEPTA's grant of sovereign immunity is that the legislature intended for SEPTA to enjoy the recognized legal protections associated with a grant of sovereign immunity. Contrary to Justice Wecht's concerns about SEPTA's ability to provide transportation services if it is compelled to submit on occasion

implicates a tribunal's jurisdiction is contrary to these well-established principles.

**5.** Other states have done so. *See, e.g.*, Ark. Code Ann. § 14–1–403 or A.C.A. § 14–1–403 ("A county, municipality, or other political subdivision of the state shall not adopt or enforce an ordinance, resolution, rule, or policy that creates a protected classification or prohibits discrimination on a basis not contained in state law."); Tenn. Code Ann. § 7–51–1802 or T.C.A. § 7–51–1802 ("No local government shall by ordinance, resolution, or any other means impose on or make applicable to any person an anti-discrimination practice, standard, definition, or provision that shall deviate from, modify, supplement, add to, change, or vary in any manner from ... types of discrimination recognized by state law but only to the extent recognized by the state.").

to the jurisdiction of the Philadelphia Commission, no serious conflict exists. The FPO provides that actions are instituted by the filing of a complaint, to which the respondent files a written answer. Phila. Code § 9–1112–13. When a complaint is filed against SEPTA that includes claims for money damages or mandatory injunctive relief, SEPTA may assert its sovereign immunity in its answer—at which time all such claims must be immediately dismissed. For claims that do not seek money damages or mandatory injunctive relief, however, SEPTA's sovereign immunity provides no protection. With respect to these claims, the FPO provides that the Philadelphia Commission may perform an investigation, hold hearings, conduct mediations or conciliations, and order non-monetary relief, including the issuance of cease and desist orders to prohibit SEPTA from engaging in conduct that is unlawful under the FPO. Phila. Code §§ 9–1105–1118. In this regard, SEPTA is obliged to participate in these processes, including attendance at mediations and conciliations in furtherance of the relief sought, and compliance with investigative subpoenas issued by the Philadelphia Commission. Phila. Code §§ 9–1113–1116. Sovereign immunity provides no bar against SEPTA's involvement in these FPO proceedings, including no shield against cease and desist orders, administrative investigations, or mediations and conciliations. SEPTA likewise has no sovereign immunity protection against the costs and expenses of participation in such litigation, including its attorneys' fees and costs associated therewith.

Having concluded that SEPTA is not immune from all FPO litigation, the comparison of consequences resulting from subjecting SEPTA to the jurisdiction of the Philadelphia Commission, or, conversely, of exempting it from compliance with the FPO, weighs strongly in favor of allowing the Philadelphia Commission to exercise jurisdiction over SEPTA. The only consequence of subjecting SEPTA to the jurisdiction of the Philadelphia Commission is that it places SEPTA and the Philadelphia Commission on equal footing in lawsuits seeking available relief. SEPTA has the right to due process in proceedings before the Philadelphia Commission, including the

right to present a defense to all allegations of wrongdoing. SEPTA also has the right to seek judicial review from orders of the Philadelphia Commission to any court of competent jurisdiction within thirty days of their entry. Phila. Code §§ 9–1105–1119.

Moreover, subjecting SEPTA to the jurisdiction of the Philadelphia Commission does not interfere with its core transportation mission. SEPTA's core mission is not merely to provide public transportation. As explained hereinabove, while the General Assembly granted SEPTA sovereign immunity, it also waived that grant of immunity with respect to compliance with the anti-discrimination provisions of the PHRA. *See* supra at 32–33, 159 A.3d at 462. Accordingly, legislative intent reflects that SEPTA's core mission is to **provide public transportation without engaging in discriminatory conduct.** Requiring SEPTA to comply with the FPO is thus entirely consistent with its core mission. In this regard, I cannot agree with the Concurrence's contention that it was the General Assembly's intent to preclude SEPTA from any participation in litigation of the type envisioned by the FPO. Such a contention amounts to an assertion that the General Assembly intended to require SEPTA to comply with some anti-discrimination laws (i.e., those in the PHRA relating to discrimination based upon, inter alia, race, color, religious creed, ancestry, age or sex, 43 P.S. § 956(a)), but to be free from any obligation to comply with other anti-discrimination laws (i.e., those in the FPO relating to discrimination based upon, inter alia, gender identity or sexual orientation, Phila. Code § 9–1103(1)). No language in any of the relevant legislation suggests any intent by the General Assembly to permit SEPTA either to engage in the types of discrimination specified in the FPO or to avoid litigation in connection therewith. SEPTA has offered no basis on which to conclude that while it can fulfill its core public transportation mission in compliance with the PHRA (and incurring associated litigation costs), it would be unable to do so if required to comply with the incremental additional anti-discrimination provisions of the FPO.[6]

6. I likewise find unpersuasive the Concurrence's assertion that compliance with the FPO would interfere with SEPTA's core mission because

On the other hand, serious consequences result from holding that SEPTA is exempt from the FPO, as the interests of entire classes of individuals otherwise protected by the FPO will have no protection from various forms of discrimination by Philadelphia's largest transportation provider. The Concurrence's position that this consequence is substantially mitigated because Philadelphia can carry out the purpose of the FPO by "enforcing it against other individuals and entities," Concurring Op. (Wecht, J.) at 29, 159 A.3d at 460, misses the mark. The aim of the FPO is not to protect some, but rather all, Philadelphians from the types of discrimination identified in the ordinance. Exempting SEPTA from the jurisdiction of the Philadelphia Commission and compliance with the FPO will interfere with the accomplishment of this purpose.

For these reasons, I dissent.

Justices Todd and Dougherty join this Dissenting Opinion.

---

the Philadelphia Commission could, hypothetically, assert a claim alleging discrimination on the basis that a neighborhood with a population of members of a protected class is underserved and then issue, as a remedy, a prohibitory injunction preventing SEPTA from re-routing buses or trains to or from that neighborhood. Concurring Op. (Wecht, J.) at 25–26, 159 A.3d at 457–58. An order as hypothesized by the Concurrence, i.e., to correct existing underservice to a particular neighborhood by re-routing service would require a mandatory injunction and would be defeated by SEPTA's sovereign immunity, if asserted.